**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

**In re CENTER FOR JUDICIAL ACCOUNTABILITY, Inc.
and ELENA RUTH SASSOWER, individually and
as director of the Center for Judicial Accountability, Inc.,**
*acting on their own behalf and on behalf of the People*
*of the State of New York & the Public Interest*

---

**<u>VERIFIED PETITION FOR A WRIT OF MANDAMUS</u>
July 10, 2026**

ELENA RUTH SASSOWER, *Pro Se*
Individually and as Director of the Center for Judicial
Accountability, Inc. (CJA), and on behalf of the People
of the State of New York & the Public Interest

    10 Stewart Place, Apartment 2D-E
    White Plains, New York 10603
    914-421-1200
    elena@judgewatch.org

GARY L. ZERMAN, ESQ.,
Attorney for the Center for Judicial Accountability, Inc. (CJA)
and on behalf of the People of the State of New York
& the Public Interest

    23935 Philbrook Avenue
    Valencia, California 91354
    661-259-2570
    gzerman243@gmail.com

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

---

**In re CENTER FOR JUDICIAL ACCOUNTABILITY, Inc.**
**and ELENA RUTH SASSOWER, individually and**      **Electorally Time-Sensitive**
**as director of the Center for Judicial Accountability, Inc.,**      **Expedition Requested**
*acting on their own behalf and on behalf of the People*
*of the State of New York & the Public Interest*

---

### VERIFIED PETITION FOR A WRIT OF MANDAMUS

The above petitioners – plaintiffs in the lawsuit *Center for Judicial Accountability, et al. v. Legislative Correspondents Association, et al.*, suing 34 illustrative press defendants for *knowingly* false, "fake news" journalism, destroying constitutional, lawful New York state governance, filed in the U.S. District Court for the Southern District of New York (25-CV-8370) – set forth the following, as required by Rule 21(a) of the Federal Rules of Appellate Procedure:

### Statement of Relief Sought
### (FRAP 21(a)(2)(B)(i))

Petitioners seek a writ of mandamus to compel the disqualification of Southern District of New York Judge Kenneth M. Karas pursuant to 28 U.S.C. §144, 28 U.S.C. §455, and the due process clause of the Fifth Amendment of the U.S. Constitution based on their June 4, 2026 affidavit for his disqualification/disclosure and its annexed certificate of good faith of the corporate petitioner's counsel.

### The Issue Presented
### (FRAP 21(a)(2)(B)(ii))

Petitioners' June 4, 2026 affidavit for Judge Karas' disqualification/disclosure pursuant to 28 U.S.C. §§144 and 455 is "timely and sufficient", thereby mandating, as 28 U.S.C. §144

1

expressly states, that he "proceed no further" and that "another judge…be assigned to hear [the] proceeding" – presently at a complete standstill by virtue of Judge Karas' failure to rule on petitioners' December 19, 2025 affidavit demonstrating subject matter jurisdiction.

**The Facts Necessary to Understand the Issue**
**(FRAP 21(a)(2)(B)(iii))**

Almost eight months ago, *within three days of being assigned to petitioners' lawsuit and before petitioners had served any of the 34 press defendants*, Judge Karas issued a *sua sponte* November 13, 2025 Order which, concealing and falsifying the unprecedented nature of what he was doing and ¶¶95(a) and (b) of their October 29, 2025 verified amended complaint pertaining to injury and standing, required the *pro se* individual petitioner and the then-unrepresented corporate petitioner to show cause why the lawsuit should not be dismissed for lack of subject matter jurisdiction, as to them.

Notwithstanding petitioners' compliance by their December 19, 2025 affidavit demonstrating subject matter jurisdiction, it is now almost seven months without a ruling by Judge Karas – and now more than five weeks without a ruling by him or any other judge with respect to petitioners' June 4, 2026 affidavit for his disqualification/disclosure pursuant to 28 U.S.C. §§144 and 455.

Ten days ago, by a July 1, 2026 letter to Judge Karas entitled "Must plaintiffs be burdened with filing a petition for a writ of mandamus to compel the Court's rulings?", petitioners stated:

> "It is now more than six months that this Court has NOT ruled on plaintiffs' December 19, 2025 affidavit in response to its *sua sponte* November 13, 2025 Order that they demonstrate subject matter jurisdiction, issued before any of the 34 defendants had even been served – and nearly a month since plaintiffs' June 4, 2026 affidavit for the Court's disqualification and disclosure pursuant to 28 USC §§144 and 455, with NO ruling by the Court.

2

Must plaintiffs file a petition for a writ of mandamus to compel the Court's rulings, which, *as a matter of law*, can ONLY be in plaintiffs' favor, based on those affidavits.

Please advise by Tuesday, July 7th, so that we will know whether we must go to the effort and $600 filing fee expense of petitioning the Second Circuit Court of Appeals for a writ of mandamus against you – which is what we otherwise will do on Friday, July 10th, to coincide with the 250th anniversary of the birth of the State of New York, here in White Plains, by the vote of the Provisional Congress of the Colony of New York, meeting at the White Plains courthouse, approving the July 4th Declaration of Independence. Here's a photo of the site, memorialized by a monument (& here) that is a ten-minute walk from the White Plains federal courthouse where you sit and a less than ten-minute walk from where plaintiffs are based.

Thank you." (capitalization, hyperlinking, italics, and underlining in the original).

There has been NO response from Judge Karas.

### The Reasons Why the Writ Should Issue
### (FRAP 21(a)(2)(B)(iv))

Petitioners meet the standard for the granting of a writ of mandamus – easily and overwhelmingly.

First, mandamus is the ONLY means by which to compel a judge to render rulings that are his duty to make.[1] At bar, Judge Karas' willful failure to rule on petitioners' December 19, 2025 affidavit demonstrating subject matter jurisdiction, in response to his own *sua sponte* November

---

[1] "A court has a ministerial duty to timely act upon pleadings filed in that court, regardless of the merit of those pleadings, and a higher court may grant a request for a writ of mandamus where a court fails to act upon pleadings within a timely manner.", 52 Am. Jur 2d §253 "Principles governing use of mandamus to compel action by courts and judicial officers—Court's failure to perform an act"

*In re A.H.*, 999 F.3d 98 (2d Cir 2021):

"The remedy of mandamus is 'traditionally...used in the federal courts…to compel [a lower court] to exercise its authority when it is its duty to do so." *Will v. United States*, 389 U.S. 90, 95 (1967) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)), also citing "*Supervisory and Advisory Mandamus Under the All Writs Act*", 86 Harv. L. Rev. 595, 599 (1973)). In the mandamus context, "[i]f a district court…refused to take some definable action that was clearly required'".

13, 2025 Order, has stalled their lawsuit indefinitely and his willful failure to rule on petitioners' June 4, 2026 affidavit for his disqualification/disclosure, arising therefrom, keeps it stalled, indefinitely, *before him*. No appeal can be taken from rulings Judge Karas is seemingly not planning to make, ever, because the ONLY rulings possible are for petitioners and would pave the way to their obtaining ***summary judgment and massive damages against defendants*** on their plainly monumental lawsuit.

Second, mandamus is the means for obtaining interlocutory appellate review of a judge's refusal to disqualify himself – functionally the same as a judge's willful failure to rule on the issue. As stated by the Federal Judicial Center's 2002 monograph Recusal: Analysis of Case Law Under 28 U.S.C. §§ 455 & 144, under the heading "Interlocutory Review" (at p. 68):

> "Often, a challenge to a judge's refusal to recuse occurs on appeal. All courts of appeals [however] permit a party to seek interlocutory review via mandamus, reasoning that, at least in some cases, the damage to public confidence in the justice system (or perhaps to the litigants) would not be undone by post-judgment appeal.[fn]".

The Federal Judicial Center's latest edition of this monograph, in 2020, entitled Judicial Disqualification: An Analysis of Federal Law, Third Edition, comparably states under the title heading "Routes of appellate review" (at pp. 99-100):

> "All courts of appeals allow a party to seek interlocutory review via mandamus,[fn] reasoning that, at least in some cases, the damage to public confidence in the justice system (or perhaps to the litigants) would not be undone by postjudgment appeal.[fn]"

The annotating footnotes furnish illustrative decisions of the courts of appeals – and among those in the 2002 monograph is *In re IBM Corp.*, 618 F.2d 923, 926–27 (1980), wherein this Court stated:

> "This court has long since taken the position that there are 'few situations more appropriate for mandamus than a judge's clearly wrongful refusal to disqualify himself.' *Rosen v. Sugarman*, 357 F.2d 794, 797 (1966). We do not read *[Will v.] Calvert Fire Insurance Co.*, [437 U.S. 655, 665-66 (1978)], to overrule sub silentio this well established rule, followed by the great majority of other circuits as well.[fn] A claim of personal bias and prejudice strikes at the integrity of the judicial

4

process, and it would be intolerable to hold that the disclaimer of prejudice by the very jurist who is accused of harboring it should itself terminate the inquiry until an ultimate appeal on the merits. We conclude that we have the power to issue the writ but only if the petitioner has satisfied the burden of establishing that its right is 'clear and indisputable.'" (hyperlinking and bracketing added)[2]

Here, petitioners' right to Judge Karas' disqualification pursuant to 28 U.S.C. §§144 and 455, based on their June 4, 2026 affidavit, is not only "clear and indisputable", but Judge Karas knows that it is "clear and indisputable", which is why he has not ruled on it. This includes its request that he disclose the facts, extrajudicial to this litigation, of his interaction, in 2012, with the individual petitioner's father, who accused him of corruption, from which, in addition to personal animus, he has personal knowledge of, and a disqualifying interest in, material allegations of petitioners' October 29, 2025 verified amended complaint, *inter alia*, of the injury and standing of the individual petitioner, alleged by its ¶95(a).

Third, mandamus being an "extraordinary writ", it is appropriate to the **extraordinary, catastrophic, emergency situation presented by petitioners'** October 29, 2025 verified amended complaint, chronicling, ***with evidence entitling them to summary judgment***, the destruction of New York's "Republican Form of Government", concealed and abetted by defendants' *knowingly* false, "fake news" journalism, injuring, massively and irreparably,[3] the State of New York and its People, including by rigging New York's elections, such as this year for governor, lieutenant governor, attorney general, comptroller, all 213 state legislative seats, and for a dozen or so D.A.s,

---

[2]      *See*, additionally, *In re IBM Corp.*, 45 F.3d 641 (2d Cir. 1995).

[3]      "When a petitioner faces significant 'irreversible, non-monetary harm'… mandamus may issue to prevent that harm. *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 353 (5th Cir. 2017). …we give consideration 'to the severity and extent of this damage, and in particular to whether a petitioner has lost precious constitutional rights.'…", *In re A.H.*, 999 F.3d 98 (2d Cir 2021).

to which Judge Karas was specifically alerted by petitioners' February 23, 2026 letter and May 8, 2026 letter.

Fourth, to the extent that this Court also allows mandamus where, in addition to "the inadequacy of other available remedies", there is "the presence of a novel and significant question of law" and "the presence of a legal issue whose resolution will aid in the administration of justice"[4], there is obviously a "novel and significant question of law" "whose resolution will aid in the administration of justice", if, as Judge Karas purported, without substantiating caselaw – and so-highlighted by petitioners' November 19, 2025 letter and December 10, 2005 letter to him – FRCP 12(h)(3) is interpreted to allow a federal district judge to *sua sponte* order a plaintiff to defend subject matter jurisdiction of a complaint that has *not yet been served upon defendants*, thereby effectively substituting himself for the defendants, who, upon being served, could make a FRCP 12(b)(1) dismissal motion, if they believed they had a subject matter jurisdiction defense.

### The Requirements of FRAP 21(a)(2)(C)

FRAP 21(a)(2)(C) states:

"The petition must include a copy of any order or opinion or parts of the record that may be essential to understand the matters set forth in the petition."

There is no order or opinion pertaining to petitioners' June 4, 2026 affidavit for Judge Karas' disqualification/disclosure pursuant to 28 U.S.C. §§144 and 455.

The only order pertaining to petitioners' December 19, 2025 affidavit demonstrating subject matter jurisdiction is Judge Karas' March 2, 2026 so-ordering of his annotation on petitioners' February 23, 2026 letter, stating:

---

[4]   *Aref v. U.S.*, 452 F.3d 202 (2d Cir. 2006), citing *In re United States*, 10 F.3d 931, 933 (2d Cir, 1993).

6

"The Court is aware of Plaintiff's response to the Court's November 2025 Order and will address the question of jurisdiction in short order. This is not the only case on the Court's docket. Plaintiff is asked to refrain from reminding the Court about what is already known to the Court."

This was quoted and <u>rebutted</u> by petitioners' May 8, 2026 letter to Judge Karas, without response from him – necessitating their June 4, 2026 affidavit for his disqualification/disclosure, as therein recited.

Petitioners' lawsuit (25-CV-8370) was filed electronically – and the entirety of the record is electronically accessible to this Court, which is how petitioners' filings are best viewed inasmuch as their substantiating hyperlinks to the record and other evidence cannot be accessed in paper format.

The electronically-filed pdfs of petitioners' June 4, 2026 affidavit and December 19, 2025 affidavit, hereinabove hyperlinked, are also annexed hereto as Exhibits A and B.

**WHEREFORE**, petitioners respectfully pray: (1) for the granting of their petition for a writ of mandamus; (2) for the disqualification of Judge Karas based on their "timely and sufficient" June 4, 2026 affidavit; (3) for the straight-forward ruling that Judge Karas was duty-bound to have made promptly, if not immediately, upon receipt of petitioners' December 19, 2025 affidavit, *to wit*: "The individual and corporate plaintiffs, having demonstrated the Court's subject matter jurisdiction, their time to serve defendants is extended 30 days from the date of this Order"; and (4) for such other and further relief as may be just and proper, including initiation of a judicial misconduct complaint against Judge Karas, pursuant to the Judicial Conference's Rules for Judicial Conduct and Disability Proceedings.[5]

---

[5] Commentary on Rule 3; Rule 4(a)(6) "Failure to Report or Disclose" & its Commentary; and Rule 5 & its Commentary.

7

_____

**ELENA RUTH SASSOWER**, *Pro Se*
Individually and as Director of the Center for Judicial
Accountability, Inc. (CJA), and on behalf of the People
of the State of New York & the Public Interest

July 10, 2026
White Plains, New York

_____

**GARY L. ZERMAN, ESQ.,**
Attorney for the Center for Judicial Accountability, Inc. (CJA)
and on behalf of the People of the State of New York
& the Public Interest

July 10, 2026
Valencia, California

## VERIFICATION

We are, respectively, the individual petitioner and counsel to the corporate petitioner herein. We have written the foregoing Verified Petition for a Writ of Mandamus and attest that same is true and correct of our own knowledge, information, and belief, under penalties of perjury.

_____

_____

8

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CENTER FOR JUDICIAL ACCOUNTABILITY, Inc.
and ELENA RUTH SASSOWER, individually and
as director of the Center for Judicial Accountability, Inc.,
*acting on their own behalf and on behalf of the People*
*of the State of New York & the Public Interest*,

Plaintiffs,

LEGISLATIVE CORRESPONDENTS ASSOCIATION, Inc.,
    [and 33 other defendants]
*being representative of other New York & national media*,

Defendants.

25-CV-8370
(Jury Trial Demanded)

Plaintiffs' June 4, 2026 Affidavit
for Disqualification/Disclosure
Pursuant to 28 USC §§144, 455

---

STATE OF NEW YORK         )
COUNTY OF WESTCHESTER    ) ss:

Elena Ruth Sassower, being duly sworn, deposes and says:

1.      I am the plaintiff *pro se*, individually and as director of the Center for Judicial Accountability, Inc. (CJA), suing, with the corporate plaintiff CJA, on our "*own behalf and on behalf of the People of the State of New York & the Public Interest*", 34 press defendants, who have yet to be served – and who, upon being served, will have NO defense to what is plainly an historic, summary judgment case.

2.      28 U.S.C. §144, pursuant to which this affidavit is filed, reads:

> "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be

1

accompanied by a certificate of counsel of record stating that it is made in good faith.”

3.      This affidavit is both timely and sufficient.  As to timeliness, this lawsuit has been at a standstill as a result of the *sua sponte* November 13, 2025 Order, issued by the Court a mere three days after being assigned to the lawsuit and before a single defendant had been served.   The facts pertaining thereto – and establishing this affidavit's sufficiency – are recited by my letters to the Court, posted on the electronic docket, culminating in my May 8, 2026 letter entitled:

“Reiterating Plaintiffs' February 23, 2026 Letter 'Awaiting the Court's ruling on plaintiffs' December 19, 2025 affidavit demonstrating subject matter jurisdiction – & extending their time to effect service on the 34 defendants', PLUS Threshold Issues of the Court's Demonstrated Actual Bias & Duty of Disclosure”. (underlining and capitalization in the original).

4.      The final paragraph of the May 8th letter – preceding the “Thank you” – read:

“In keeping with the promise of Rule 1 of the Federal Rules of Civil Procedure of a 'just, speedy, and inexpensive determination of every action and proceeding', please advise:

- whether the Court will recuse itself for the demonstrated actual bias my December 10th letter particularizes and which this letter additionally particularizes; and, if not,

- whether the Court will disclose facts bearing upon its fairness and impartiality, as requested by my November 19th letter;

- the date by which the Court will 'address the question of jurisdiction in short order'”.

5.      It is now four weeks since my May 8th letter, without response from the Court – and, as clear from the electronic docket, the Court cannot respond without conceding: (1) its duty of recusal for the demonstrated actual bias already particularized; (2) its duty of disclosure; and (3) that there is no “question of jurisdiction” needing to be “address[d]” because my December 19th affidavit blew to smithereens any such “question”, mandating an IMMEDIATE one-sentence

order that "I and CJA had met our burden of demonstrating injury and standing, which was the subject matter jurisdiction inquiry raised by the Court's *sua sponte* November 13th Order… followed by a second sentence extending plaintiffs' time within which to serve defendants by 30 days".

6.        Moreover, I now believe that irrespective of whether the Court was randomly assigned "by lot" to this lawsuit – and, as pointed out by my December 10th letter (at pp. 2-3, 6), the Court "makes NO affirmative statement" that it was – it knew that its duty was to decline the assignment pursuant to 28 U.S.C. §455, which reads, in pertinent part:

"(a)   Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b)   He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

…

(e)   No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification."

7.        Surely, upon the Court's assignment to this lawsuit on November 10th, it recognized from my last name, from the content of the October 29th verified amended complaint pertaining to the destruction of constitutional, lawful New York state governance involving the state judiciary and state attorney general, enabled and accelerated by *knowingly* false, "fake news" journalism of a corruption-abetting, election-rigging press, and from the verified amended complaint's ¶95(a) – the same paragraph that the Court's *sua sponte* November 13th Order (at pp. 3-4) would materially

3

expurgate to remove its particulars relating to my parents so as to purport that I had not alleged injury and standing as to myself, identified by ¶21 of my December 19th affidavit – is that it had "personal knowledge" of this lawsuit's underlying material facts by virtue of its interaction, 13 years earlier, with my father, George Sassower, Esq., giving rise to my father accusing the Court of corruption, filing an affidavit for the Court's recusal pursuant to 28 U.S.C. §144, and seeking access to the federal grand jury in White Plains to present the evidence with respect thereto.  As to this, I knew nothing, until April 11, 2016.

8.    It was then, while drafting my April 14, 2026 grand jury/public corruption complaint to New York's 62 district attorneys pertaining to the FY2026-27 state budget and 2026 elections – to which my May 8th letter refers and links – that I discovered amongst the remnants of my father's papers pertaining to his attempts, spanning decades, to testify before a grand jury about the corruption of New York's state judiciary and state attorney general and its metastases to the federal courts, his December 3, 2012 letter to the then Chief Judge of the U.S. District Court for the Southern District of New York Loretta Preska entitled "Crime in the U.S. Courthouse at White Plains (Leave to File)", stating that the Court had:

> "concocted & contrived the existence of a valid Order which requires that I, a born American citizen & battle-star veteran of World War II, needs the permission of a judge or magistrate to have my information & evidence transmitted to the Grand Jury!" –

to which the Court was an indicated *cc* and whose appended "Leave to File" bore the Court's name in its caption:

> "In the Matter of the Petition of
> GEORGE SASSOWER, individually and on behalf of
> THE GRAND JURY FOR THE SOUTHERN DISTRICT
> OF NEW YORK, at WHITE PLAINS,
>
> Petitioner,

4

For leave to file an 18 *U.S.C.* §3332(a) Grand Jury
Petition Concerning the Criminal Racketeering Activities
in the Southern District of New York, at WHITE PLAINS

-against-

[U.S. Attorney] PREET BHARARA,
[New York State Attorney General] ERIC T. SCHNEIDERMAN
and [U.S. District Court Judge] KENNETH M. KARAS,

Respondents."
(capitalization, italics, and brackets in the original)

Quoted therein was my father's August 1, 2012 letter to the federal grand jury foreperson and members at the White Plains address of the U.S. District Court for the Southern District of New York – and this I also found.  Both referenced, as a starting point, my father's 1987 lawsuit *Vilella v. Santagata*, 87 Civ. 1450 (GLG), filed in the White Plains U.S. District Court for the Southern District of New York, whose March 4, 1987 petition I had long ago scanned and posted on CJA's website as part of "The George Sassower, Esq. Legacy Project – Was he correct on the facts & on the law?"

9.       Unable to find more in the remnants of my father's papers – and, as yet, unable to access his computerized records – I went to the courthouse yesterday so as to be able to include more in this affidavit.  The priority was to examine the record of my father's litigation before the Court,[1] no part of which I had, and whose docket number and caption I also did not have – and to ascertain what had become of his "Leave to File" submission to then Chief Judge Preska, whose p. 4 stated:

---

[1]     The legitimacy of judicial decisions can only be determined by comparison with the record.  As stated in "*Legal Autopsies: Assessing the Performance of Judges and Lawyers Through the Window of Leading Contract Cases*", 73 Albany Law Review 1 (2009, Professor Gerald Caplan), "…Performance assessment cannot occur without close examination of the trial record, briefs, oral argument and the like…' (p. 53).

5

"On July 24, 2012, affirmant filed a timely & sufficient 28 *U.S.C.* §144 recusal application, whose allegations & conclusions, including the propriety of this application, were not denied or controverted by anyone.

Nevertheless, U.S. District Court Judge Kenneth M. Karas did not address such application, including "time[liness] & sufficiency', or obey the mandate of the statute."

10.     A search of my father's name at the computer terminal in the Clerk's Office did not reveal any 2012 lawsuits – nor the 1987 *Vilella v. Santagata* lawsuit.  Upon returning to the Clerk's Office today, the paper docket sheet for *Vilella v. Santagata* was located, reflecting proceedings before the Court in 2012.  Not reflected, however, was my father's July 24, 2012 recusal application pursuant to 28 U.S.C. §144, referred-to by his December 3, 2012 "Leave to File" submission to then Chief Judge Preska.  Upon requesting the lawsuit file, a slim manilla folder was produced containing four documents[2], totalling 6 pages, none from my father, and missing the Court's July 13, 2012 Order, listed as #51 on the docket.

11.     Can the Court explain this and does it know the whereabouts of my father's docketed filings (#45, #46, #47, #49, #50, #52, #53), bearing upon its duty, from the outset, to have disqualified itself from this lawsuit, pursuant to 28 U.S.C. §§455(a) and (b), or, at very least, to have made disclosure, as provided for by 28 U.S.C. §455(e) – rather than, as it did, issue its *sua sponte* November 13th Order and continue with the further actually-biased conduct chronicled by my November 19th letter, December 10th letter, February 23rd letter, and May 8th letter.

---

[2]     These are: (1) a June 19, 2012 notice from the *pro se* office; (2) the August 13, 2012 letter from the New York Attorney General, so-ordered by the Court on August 21, 2012; (3) the Court's September 7, 2012 Order; and (4) a September 17, 2012 notice from the Clerk's Office to the Court, with the Court's September 17, 2012 response.

12.    This affidavit, made in good faith and under penalties of perjury, is additionally accompanied, as 28 U.S.C. §144 requires, by "a certificate of counsel of record stating that it is made in good faith."   Annexed hereto is the certificate of Gary Zerman, Esq., counsel of record for the corporate plaintiff CJA.


_____
                        Elena Ruth Sassower


Sworn to before me
this 4th day of June 2026

_____
                        Notary Public

JAIR E. CORREA
Notary Public - State of New York
No. 04CO6446153
Qualified in Westchester County
My Commission Expires 01/17/20__

7

## CERTIFICATE OF GOOD FAITH PURSUANT TO 28 U.S.C. §144

I am counsel of record for the corporate plaintiff Center for Judicial Accountability, Inc. (CJA). I have read the accompanying affidavit of the *pro se* individual plaintiff Elena Sassower, which she has written, and certify, based on my conversations with her and the documents to which her affidavit refers and links, which I have reviewed, that such affidavit is made in good faith.

Additionally, I confirm that on April 11, 2026, plaintiff Sassower alerted me to her father's December 3, 2012 letter to then U.S. Southern District of New York Chief Judge Preska and his related August 1, 2012 letter to the federal grand jury, which she had just found. We discussed how best to proceed and agreed that if the Court did not rule on her December 19, 2025 affidavit by May 8, 2026 – the 81st anniversary of V.E.-Day and her 70th birthday – she would file a letter with the Court and, absent a response, would file an affidavit pursuant to 28 U.S.C. §144 and §455 by no later than June 6, 2026 – the 82nd anniversary of D-Day. As such date is a Saturday, her affidavit is being filed today, June 4, 2026 – the 46th anniversary of the involuntary dissolution of Puccini Clothes, Ltd. by New York Supreme Court, which was the genesis of her father's massive state and federal litigations that in 2012 landed him before the Court.

GARY L. ZERMAN, ESQ.

June 4, 2026

8

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

CENTER FOR JUDICIAL ACCOUNTABILITY, Inc.
and ELENA RUTH SASSOWER, individually and
as director of the Center for Judicial Accountability, Inc.,                    25-CV-8370
*acting on their own behalf and on behalf of the People*                    (Jury Trial Demanded)
*of the State of New York & the Public Interest*,

Plaintiffs,        Plaintiffs' Dec. 19th Affidavit
Demonstrating Subject Matter
Jurisdiction in Response to the
-against-                               Court's Nov. 13th *Sua Sponte* Order
& Dec. 5th Order

LEGISLATIVE CORRESPONDENTS ASSOCIATION, Inc.,
    [and 33 other defendants]
*being representative of other New York & national media*,

Defendants.
_____

STATE OF NEW YORK            )
COUNTY OF WESTCHESTER       ) ss:

Elena Ruth Sassower, being duly sworn, deposes and says:

1.      I am the plaintiff *pro se*, "individually and as director of the Center for Judicial Accountability, Inc.", bringing this lawsuit with plaintiff Center for Judicial Accountability, Inc. on our "*own behalf and on behalf of the People of the State of New York & the Public Interest*".

2.      This affidavit is submitted in response to the Court's *sua sponte* November 13th Order for plaintiffs to show cause why their claims should not be dismissed for lack of subject matter jurisdiction.

3.      By a November 19th letter, I furnished a preliminary response, setting forth the procedurally unprecedented manner in which the Court was proceeding.  The Court's December 5th Order only reinforced this – and I set this forth by a December 10th letter, to which the Court

1

has not responded.  This is particularly disappointing as my letter enclosed the draft affidavit I had completed on November 24th in support of subject matter jurisdiction, as to which I stated:

> "it would be most helpful if the Court would confirm that such drafted affidavit, when I have signed and filed it in support of plaintiffs' October 29th verified amended complaint, will suffice to establish the Court's subject matter jurisdiction – or else identify what further elaboration the Court deems necessary at this 'pleading stage'.  *Bauer v. Veneman*, 352 F.3d 625, 636-37 (2d Cir. 2003).
>
> Such guidance would accord with the solicitude that judges are expected to extend to *pro se* litigants, *Craig v. City of New York*, 24-1180-cv (2nd Cir., June 6, 2025) – and is especially appropriate where, as here, the *pro se* has brought a clearly monumental, summary judgment case, of gravity and reach, against 34 media defendants, having hundreds of top lawyers between them – and that's just their lawyers who are 'in house' and regularly retained.[fn2]"

4.    As I believe my drafted affidavit to be more than sufficient to establish the Court's subject matter jurisdiction, below, unchanged, is its presentation with respect thereto.

* * *

5.    As stated by ¶1 of plaintiffs' October 29, 2025 verified amended complaint,[1] this lawsuit is brought pursuant to Article 4, §4 of the U.S. Constitution and the First, Fifth, and Fourteenth Amendments.  The district court's subject matter jurisdiction, based thereon, is pursuant to 28 U.S. Code §1331, stated by the complaint's ¶2 – this being a "civil action[] arising under the constitution".  None of these provisions are acknowledged by the Court's Order,

---

"[fn2]    *Cf,* the situation described by the 1993 monograph of the Twentieth Century Fund, entitled "The 'Muzzled Media': Constitutional Crisi or Product Liability Scam?" by Martin London, Esq."

[1]    The  October 29, 2025 verified amended complaint, which added nine additional press defendants and subsequent factual allegations, is materially identical to the October 8, 2025 verified complaint.  For brevity – and in keeping with the Court's Order – it will be hereinafter referred to as the "complaint".

notwithstanding their invocation by plaintiffs accords with "U.S. Const. art. III, §2, cl. 1"[2], to which the Order does cite.

6.      Instead, the Court flips (at p. 1) to "Constitutional standing", whose three-fold requirements it identifies by quoting (at p. 2) from the Second Circuit's 2016 decision in *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358:

> "(1) that the plaintiff ha[s] suffered an 'injury in fact' — that is, 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical,'; (2) that there is 'a causal connection between the injury and the conduct' of which the plaintiff complains; and (3) that it is 'likely . . . that the injury will be redressed by a favorable decision.' Id. (second alteration in original) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992))."

Plaintiffs meet these requirements, easily – and overwhelmingly.

7.      This being the pleading stage, plaintiffs filed their complaint consistent therewith. As stated in the Second Circuit's 2003 decision in *Bauer v. Veneman*, 352 F.3d 625, 636-37, which the Court's Order also quotes, but not this portion:

> "at the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury. *See [Lujan].* (recognizing that '[a]t the pleading stage, general factual allegations of injury ... may suffice [to establish standing], for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim') (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)) (alteration in original). It bears emphasis that under federal pleading rules, '[c]omplaints need not be elaborate, and in this respect injury (and thus standing) is no different from any other matter that may be alleged generally.' *See South Austin Coalition Comm. v. SBC Communications*, 274 F.3d 1168, 1171 (7th Cir. 2001)."

---

[2]      It reads, by its very first words:

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution…"

8.    Thus, plaintiffs' complaint, under the title "Statement in Further Support", states, at its ¶¶93-95:

"93.  Acting on their own behalf and on behalf of 'the People of the State of New York & the Public Interest', plaintiffs seek the redress that the United States Constitution expressly provides by the guarantee clause of Article 4, §4, 'The United States shall guarantee to every State in this Union a Republican Form of Government…', through the First Amendment's guarantee of 'the right of the people…to petition the Government for a redress of grievances', and the further guarantees to every 'person', by the Fifth and Fourteenth Amendments, of due process and equal protection.

94.  Based on these provisions – and the facts hereinabove summarized, with evidence – plaintiffs are here suing defendants for violating their 'free press' First Amendment responsibilities by *knowingly* false journalism, concealing from the People of New York the true state of their state government, *to wit*, that New York's 'Republican Form of Government' no longer exists because the state's highest constitutional officers of its three government branches have been colluding with each other in flagrantly violating the state's Constitution, laws, and rules, eviscerating mandated checks and balances, including by 'public protection'/ethics and criminal entities that insulate them from any consequence for violations – and that, in so doing, these defendants have been, and are now, rigging New York elections.

95.  The foregoing provides plaintiffs with standing and establishes injury, which, as to the latter, is further particularized, as follows:

a.    As to Plaintiff SASSOWER, the corruption of New York's judiciary, of constitutional, lawful state governance, and the complicity of the press, including many that are defendants herein, destroyed the lives and professional careers of her patriotic and courageous judicial whistle-blowing parents, both lawyers, George Sassower, Esq. and Doris L. Sassower, Esq., impacting irreparably and deleteriously upon their three daughters and, as to the oldest, Plaintiff SASSOWER, destroying and derailing her own life and career, beginning when she was a child – and she is now 69.

b.    As to Plaintiff CJA, the violation of First Amendment responsibilities and journalistic codes by the press, including most of the defendants herein, has meant that all its hard, painstaking work, spanning more than three decades, has brought no corruption-eradicating changes – when even a modicum of press adherence to such responsibilities and codes, of which there was none, could have brought sweeping corruption-eradicating changes, speedily – and simply by government fidelity to the constitutional provisions, laws,

4

and rules being violated.  The near total press suppression of any report of Plaintiff CJA's work, other than in minimizing, deprecating terms, deprived it of any public profile and appreciation – and all the benefits flowing therefrom to its development as a non-partisan, non-profit citizens' organization, needing membership and funding.

c.        As to 'the People of the State of New York', they have been kept 'clueless' by their 'free press' as to how they have been betrayed by their elected and appointed constitutional officers in their three government branches whose flagrant violations of their oaths of office, the state Constitution, laws, and rules, steal their money, massively, and enact and enable the enactment of policies, without legislative due process and by fraud, including as relates to elections, destroying a 'Republican Form of Government'. As journalism is the 'first draft of history', the state's history and that of its People has been falsified by its 'free press', relied upon by scholars in the belief that it is accurate and true, and by the culpable journalists themselves, many of whom go on to write books." (underlining in the original).

9.        With respect to the corporate plaintiff CJA, the same standing requirements as pertain to me pertain to it.  As stated by the Second Circuit's 2011 decision in *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294:

"the organization is just another person—albeit a legal person—seeking to vindicate a right. To qualify, the organization itself 'must 'meet[ ] the same standing test that applies to individuals.' '*Irish Lesbian & Gay Org.,* 143 F.3d at 649[3] (quoting *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990))".

10.        As to CJA's injuries, attributable to defendants, ¶95(b) identifies "membership and funding".  These injuries confer standing, evident from the Court's Order, citing (at p. 4) the Second Circuit's 2024 decision in *Port Auth. Police Benevolent Assoc. v. City of New York*, 718 F.Supp. 3d 300, 308, itself citing the Court's **own** 2021 decision in "*Orthodox Jewish Coal, of Chestnut Ridge v. Village of Chestnut Ridge,* No. 19 Civ. 443 (KMK), 2021 WL 1226930, at *14*"

---

[3]        *Irish Lesbian and Gay Org. v Giuliani, et al.*,  143 F.3d 638 (2d Cir. 1998).

for the proposition "(Article III injury supported by loss of membership)". That decision, in turn, cites to the Second Circuit's 2019 decision in *Dhinsa v. Kruege*, 917 F.3d 70, 78, (2019), stating:

> "monetary loss is a quintessential injury in fact, and even a small financial loss suffices to establish standing".

11.     As part of, yet also separate from, "pocketbook injury", the Second Circuit's *Port Authority* decision cites to its 2017 decision in *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111, for the proposition:

> "([W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." (citing *Havens Realty Corp*., 363, 379 (1989)))".

The elaboration of this in *Centro* is, as follows:

> "where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing. *See Havens Realty Corp.*, 455 U.S. at 379[4]…(a 'concrete and demonstrable injury to [an] organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests'…*Nnebe*, 644 F.3d at 157;[5] Ragin, 6 F.3d at 905.[6] Significantly, the Supreme Court has…reaffirmed *Haven Realty*'s holding that a nonprofit organization establishes an injury-in-fact if, as here, it establishes that it 'spent money to combat' activity that harms the organization's core activities. *Bank of Am. Corp. v. City of Miami*, -- U.S. --, 137 S.Ct. 1296, 1303…(2017)".

12.     As with financial injury, the magnum is small. As stated by the Second Circuit in *Centro*, citing to Supreme Court authority and its own prior decisions in conformity therewith:

> "The Supreme Court has held that an organization establishes an injury-in-fact if it can show that it was 'perceptibly impaired' by defendant's actions. *Havens Realty*

---

[4]     *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).

[5]     *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011).

[6]     *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993), identified in Port Authority as "organization alleged sufficient injury to protected interest where allegedly unlawful activity required it to spend time attempting to combat activity's effects rather than undertaking normal operations".

6

*Corp. v. Coleman,* 455 U.S. 363, 379, ... (1982). Consequently, we have repeatedly held that 'only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.' *Nnebe*, 644 F.3d at 157 (quoting *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993))*; N.Y. Civil Liberties Union v. N.Y.C. Transit Auth*, 684 F.3d 286, 294 (2d Cir. 2011); *N.Y. State Citizens' Coal. for Children v. Velez* , 629 Fed.Appx. 92, 94 (2d Cir. 2015)."

13.     At bar, the press' violation of their First Amendment responsibilities to report on the corruption of governance and public officers – and their rigging of elections as part thereof – forced plaintiff CJA to divert its limited resources away from its "core activities" of judicial accountability and organizational-building – the latter having to be ended completely – in order to expend MASSIVE amounts of time, energy, and money on repetitively soliciting and importuning reporters, editors, and then supervisory levels – and never with any result other than the further and accelerating deterioration of constitutional, lawful governance, resulting from the press' knowing and deliberate blockade on truthful, accurate reporting, in favor of falsification of what was and is going on.

14.     To overcome this, plaintiff CJA initially took out public interest ads, at significant cost – the most expensive being its $16,770 paid ad "*Where Do You Go When Judges Break the Law?*", published on the Op-Ed page of The New York Times on October 26, 1994, and reprinted, on November 1, 1994, at page 9 of the New York Law Journal, at a $2,282.57 cost.  Other ads included "*A Call for Concerted Action*", published in the November 20, 1996 New York Law Journal, at a cost of $1,648.36, and "*Restraining 'Liars In the Courtroom' and On the Public Payroll*", published at pages 3-4 of the August 27, 1997 on the New York Law Journal, at a cost of $3,077.22.   These I furnished to the press, for years – with none making the slightest dent in budging investigative reporting – or any reporting at all.  All the flagrant violations of law and corruption that these ads summarize – and which have been the subject of repetitive evidentiary

7

presentations that I have made to the press throughout these subsequent decades – have continued, unabated.

15. Thereafter, as a further solution, plaintiff CJA diverted thousands of dollars – and expended thousands of hours of time – on its two state lawsuits against the press – from 2006-2008 against The New York Times and from 2010-2013 against Gannett – to establish the "journalistic fraud" and "institutional reckless disregard for truth" causes of action and, simultaneously, to fight back against their besmirching, defamatory journalism, concealing and falsifying the facts pertaining to governance and public officers that were their duty to investigate and report.

16. As to the latter, the Second Circuit's *Port Authority* decision cites to its 1998 decision in *Irish Lesbian and Gay Org.* (at p. 650), for the proposition: "(organization could make out Article III injury based on alleged harm to reputation)". Defendants have injured CJA in this respect as well – and ¶95(b) of the complaint so-reflects.

17. Besmirching, defamatory journalism, aimed at diminishing CJA and making a spectacle of me and my mother, Doris L. Sassower, Esq., CJA's co-founder with me, has been a hallmark of defendants' reporting on us – the purpose of which has been to prevent public knowledge and appreciation of CJA's achievements in exposing, with fact and law, the corruption of governance and public officers – and stunt plaintiff CJA's organizational development, totally.

18. Two notable examples, in addition to the November 7, 2004 column "*When the Judge Sledgehammered the Gadfly*", upon which plaintiffs' libel claims in their lawsuit against The New York Times were based, and the May 6, 2009 article "*Hecklers try to derail new judge*", upon which plaintiffs' libel claims in their lawsuit against Gannet were based, are:

- the New York Post's April 17, 2023 article "*Court of Appeals pick Rowan Wilson clears NY state Senate Judiciary panel*" by its then reporter Zachary Williams, stating – referring to me –

> "A female protester briefly interrupted the proceedings by demanding to testify against Wilson, who she alleged was corrupt for unspecified reasons.
>
> "We do have her testimony, as it were," Hoylman-Sigal said."[7]

- the November 30, 2018 live twitter feed of Politico reporter Bill Mahoney, with screenshots of me testifying before the Committee on Legislative and Executive Compensation, with his sarcastic captioning "Scott Stringer looks enthused to be listening to Elena Sassower, Albany's most regular testifier", followed by "DiNapoli also pumped to hear this".[8]

19.     As to myself as the individual plaintiff – which, as identified by the complaint's caption, is in two capacities "individually and as director of the Center for Judicial Accountability, Inc."— all of the financial and organizational injury to plaintiff CJA is injury to me, as I am its sole staff, unpaid, and its sole financial support – and have been for more than a decade.  Before that, the only other unpaid staff was my mother, who also contributed financial support.

20.     That ALL my 24/7 work, spanning decades, has come to nothing, substantively or organizationally, is a massive injury to me, in both my individual and professional capacities, attributable to the press.  This injury is evident from the most cursory examination of my workproduct – accessible from CJA's website and hyperlinked by the complaint – not just

---

[7]     My prior e-mail to Mr. Williams – who well knew who I was, from years of prior e-mails from me, when he was writing for City & State – sent at 8:46 pm on April 16, 2023, is here, followed by my April 17, 2023 e-mail sent at 5:14 am, is here and, prior thereto, at 4:51 am, is here.  As I recollect, an AP photo and caption "New York State Senate Sargent at arms surround Elena Sassower who protested the confirmation of chief judge of the court of appeals nominee Rowan D. Wilson" was also posted on The New York Post website.  This was the ONLY reporting of CJA's serious and substantial opposition to then Associate Judge Wilson's confirmation as chief judge – concealing, *in toto*, all the facts and law my e-mails furnished in connection therewith, including the corruption of then Senate Judiciary Committee Chair Hoylman-Sigal, in plain sight, at the hearing and prior thereto..

[8]     Here, too, there was nothing about the serious and substantial content of my testimony, exposing the fraud of the November 30, 2018 article he would thereupon write, false from its very title, "*Heastie makes the case for a pay raise*".

newsworthy, but mandating report by any press purporting to fulfill First Amendment responsibilities, with salutary, corruption-eradicating results, redounding to CJA's credit, public profile, and ability to grow organizationally, with money, through membership and grants, to hire paid staff. <u>The complaint's ¶95(b) pertaining to CJA's injury is identically injury to me, individually and professionally, as CJA's only staff and funder</u>.

21.     Unlike ¶95(b) pertaining to CJA, not quoted by the Court's Order, its page 3 does quote from ¶95(a) pertaining to me – expurgating it so as to state that it does not "satisfy the causal connection component of standing" by "'alleg[ing] personal injury fairly traceable to the defendant's allegedly unlawful conduct.'". Having <u>cherry-picked out</u> the text identifying "[the corruption] of constitutional, lawful state governance" and that my parents were "patriotic and courageous judicial whistle-blowing…lawyers", and that I "was a child – and…now 69", the Order states (at p. 3):

> "As currently plead, Plaintiffs' the Amended Complaint does not explain the causal connection between Defendants' actions and the harm alleged to Plaintiff Sassower or her parents. Instead, Plaintiffs focus on how Defendants' alleged complicity in the corrupt governance of New York State harms the people of the State of New York at large. (*See* Am. Compl. at 34–81.)".

22.     <u>As relates to ¶95(a)'s summarized injury to me, individually, separate from CJA, attributable to defendants,</u> any press upholding First Amendment responsibilities would have investigated the vicious retaliation to which my judicial whistle-blowing lawyer-parents alerted them, including fraudulent judicial decisions, *inter alia*, stripping them of their law licenses – and the corruption of ALL safeguards from which to secure redress. Yet, despite their massive outreach to the press, and my own, on their behalf – starting with my first, <u>my June 4, 1989 letter to reporters,</u>

written while my father was incarcerated[9] – the press, instead of being a constitutional safeguard,

were willing collaborators in the complained-against judicial and other corruption, repeating lies

without concerning themselves with evidence establishing the truth.

23.　　As to the press' injury to my parents and our family, it is reflected by their lawsuits

against the press.

24.　　My father brought at least the following:

- a lawsuit against the <u>Daily News</u>, among other defendants (Westchester Co. Index #10726-1978), whose December 15, 1978 amended verified complaint is <u>here</u>;

- a lawsuit against the <u>New York Law Journal</u>, among other defendants, whose April 23, 1979 verified complaint is <u>here</u> (Westchester Co. Index #3607-1979);[10]

- a lawsuit solely against the <u>New York Law Journal</u>, whose April 23, 1979 verified complaint is <u>here</u> (Westchester Co. Index #3608-1979);

- a lawsuit against the <u>New York Law Journal</u>, among other defendants, whose August 18, 1982 verified complaint is <u>here</u> (Nassau Co. #20987-1982);

- a lawsuit against the Daily News, among other defendants, commenced in 1983/1985? (NY Co. #5774).

25.　　As for my mother, she filed an October 26, 1992 summons with notice against

Gannett (Westchester Co #29094/92), <u>here</u>, but due to the catastrophic judicial retaliation she and

I were facing, at that time, was unable to proceed beyond that.  Seventeen years later, the facts

pertaining thereto were summarized at ¶4 of the <u>October 4, 2010 verified complaint</u> in the lawsuit

---

[9]　　My father's incarceration, as prisoner #16293054, did not stop him from his own outreach to the press, as reflected by <u>his June 30, 1989 letter to a New Jersey Law Journal reporter</u>, stating to her "whatever documentation you need, you merely have to request from my daughter Elena".  The reporter's subsequent article, not based on investigation of such documentation, was published July 13, 1989, on the <u>Law Journal</u>'s front page, with the title "<u>*Frequent Filer Brings His Crusade to N.J.*</u>", and includes my arrest, on bogus grounds, for rushing to my incarcerated father at the close of a May 23, 1989 hearing.

[10]　　Although the plaintiffs in #3607-1979 are my mother and sister – and my mother has signed the complaint, as attorney – it was written and litigated by my father.

11

against Gannett, whose plaintiffs were myself and my mother, each of us individually and in our respective capacities as CJA's director and president, and CJA, all three of us acting "Pro Bono Publico". In addition to annexing the 1992 summons with notice as Exhibit 3(a), the verified complaint annexed, as Exhibit 2(a), my April 4, 1992 fax to Gannett entitled "Your Libelous and Malicious story, appearing in today's newspaper…", stating:

> "This is to record the fact that ten minutes ago, at 9:25 a.m., I received an offensive and insulting telephone call from a reader of your newspaper who told me that she was 'sick and tired' of reading the kind of stories about Doris Sassower and her daughter that have been appearing in your paper.
>
> She refused to identify herself, but told me she would 'write an editorial' to the Gannett newspapers. Before I could even say anything in defense of myself or my mother, she hung up on me.
>
> Immediately thereafter, I attempted to call the Metro Desk (694-5014) – but no one picked up the telephone…"

and, as Exhibit 2(b), my mother's fax to Gannett six hours later, stating:

> "This is to record the fact that at 12:50 p.m. today, I received a threatening telephone call from a man who stated that 'the ways of the Sassowers will be bombed tonight at 5 p.m., fuck off'.
>
> I consider this threat to be a direct result of the deliberate smear campaign that Gannett has conducted against me. You have deliberately. and without justification, incited such hostility in the community as to now present a threat of physical harm to me and my family. We hold you responsible for the adverse consequences of today's false, distorted and defamatory story--as well as preceding ones of the same ilk.
>
> The White Plains Police have already been notified. We request that your lawyers contact us immediately so that appropriate steps can be taken to deal with the dangerous situation which has been created by you.
>
> My daughter called up Gannett at approximately 1:30 p.m. She confirmed with Mr. Kieran O'Leary, the editor in charge, that her faxed communication of 9:40 this morning had been received. She also related the foregoing telephone-threat to him. …" (underlining in the original).

12

The verified complaint additionally annexed, as Exhibit 3(b), Exhibit 3(c), and Exhibit 3(d), correspondence from December 1995, reflecting Gannett's retaliation against us at that time, based on the 1992 summons and notice, served upon Gannett in February 1993.

26.    Obviously over and beyond the trauma and other life-disrupting and warping consequences of the press' violation of its First Amendment duties pertaining to my parents, I suffered the financial injury they suffered – including the monies they were unable to leave to me and my two sisters because of what the press enabled to be done to them.

27.    As for "the People of the State of New York", the Order recognizes (at p. 3) that the focus of the amended complaint "(at 34–81.)" is the injury to the People, attributable to the press.  It does not purport any deficiency in the particularization of the injury.  Nor does the Order appear to challenge that plaintiff CJA can act on behalf of the People.  Instead, the Order seems to imply that I, as a non-attorney, cannot act on the People's behalf, further introducing the concept of "third party", stating (at p. 3), as to this:

> "the Supreme Court has routinely held that 'one may not claim standing . . . to vindicate the constitutional rights of some third party.' *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) (internal quotation marks and citations omitted); see also *Hollingsworth v. Perry*, 570 U.S. 693, 707–08 (2013) (noting that 'a litigant must assert his or her own legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties.' (internal quotation marks and citation omitted)).'"

28.    This materially misrepresents these two cases to remove the qualifications that are part of what "the Supreme Court has routinely held":

(a) In *Singleton v. Wulff*, the Supreme Court stated (at pp. 114-116):

> "the Court's general rule: '**Ordinarily**, one may not claim standing in this Court to vindicate the constitutional rights of some third party.' *Barrows v. Jackson,* 346 U.S. at 346 U. S. 255. *See also Flast v. Cohen,* 392 U.S. at 392 U. S. 99 n. 20; *McGowan v. Maryland,* 366 U. S. 420, 366 U. S. 429 (1961).
>         **Like any general rule, however, this one should not be applied where its underlying justifications are absent**. With this in mind, the Court has looked

13

primarily to two factual elements to determine whether the rule should apply in a particular case. The first is the relationship of the litigant to the person whose right he seeks to assert.   If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter. …

The other factual element to which the Court has looked is the ability of the third party to assert his own right. Even where the relationship is close, the reasons for requiring persons to assert their own rights will generally still apply. If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes, by default, the right's best available proponent."  (bold added).

(b) In *Hollingsworth v. Perry*, the Supreme Court reiterated:

"'**[i]n the ordinary course**, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.' *Powers v. Ohio*, 499 U. S. 400, 410 (1991). **There are 'certain, limited exceptions' to that rule.** *Ibid*. But even when we have allowed litigants to assert the interests of others, the litigants themselves still 'must have suffered an injury in fact, thus giving [them] a sufficiently concrete interest in the outcome of the issue in dispute.' *Id.,* at 411 (internal quotation marks omitted)."  (bold added).

29.     As to the "third party" issue, the Order's further cited case (at p. 2) of "*Wright-Upshaw v. Nelson*, 13-CV-33, 2014 WL 692870, at *4 (E.D.N.Y. Feb. 19, 2014)," sets forth the state of the law:

"a plaintiff asserting a claim on behalf of a third party must satisfy all of the constitutional standing requirements and must additionally demonstrate 'a close relation to the injured third party and a hindrance to that party's ability to protect its own interests.' Mid-Hudson, 418 F.3d at 174."[11]

30.     Having now, by the above-particularization of the complaint's ¶95(a), satisfied the "constitutional standing requirements" as to myself of injury, attributable to defendants, here is the

---

[11]     *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005).

required "close relation to the injured third party and a hindrance to that party's ability to protect its own interests".

31.     I have a "close relation" to "the People of the State of New York", the subject of the complaint's ¶95(c), as I am one of those People, yet materially different in that I am not "clueless" as to what has been going on, "destroying a 'Republican Form of Government'", concealed and abetted by the press, with which I have interacted for decades, at injurious personal cost.  This press-caused "clueless"-ness wholly prevents "the People of the State of New York" from protecting themselves in ANY respect – including by elections to "throw the bums out" – these bums being their elected constitutional officers in New York's three branches of its state government who have betrayed the People by their violations of their oaths of office.

32.     Indeed, at issue is not just "hindrance", but the <u>utter impossibility</u> of  a "clueless" "People of the State of New York" protecting their own interests, other than through CJA and myself, where, moreover, the only state officers who would have standing to do so – first and foremost, New York's Attorney General – are the very ones who have subverted New York's "Republican Form of Government".

33.     In this regard, this case meets the high standard for "third party" standing that was focal to Justice Powell's dissent in *Singleton v. Wulff*, wherein, joined by Chief Justice Burger and Associate Justices Stewart and Rehnquist, he stated (at p. 126):

> "assertion is proper not when there is merely some 'obstacle' to the [third party] rightholder's own litigation, but when such litigation is, <u>in all practicable terms, impossible</u>."  (underlining added).

15

34.    All of the foregoing, sufficient at the pleading stage – and for summary judgment – represents concrete and actual injury, past and ongoing, attributable to defendants, remedial by the complaint's four causes of action, for "Journalistic Fraud", "Institutional Reckless Disregard for Truth", "Defrauding Purchasers, Contributors, & Taxpayers", and "Conspiracy" – and by its requested other and further relief:

> "referring defendants to the U.S. Department of Justice and Federal Communications Commission for investigation and prosecution of their frauds and conspiracy crimes."


_____
Elena Ruth Sassower


Sworn to before me
this 19th day of December 2025

_____
Notary Public

JAIR E. CORREA
NOTARY PUBLIC, STATE OF NEW YORK
NO. 04CO6446153
QUALIFIED IN WESTCHESTER COUNTY
MY COMMISSION EXPIRES JANUARY 17, 2027

16

## CERTIFICATE

ELENA RUTH SASSOWER, the individual petitioner *pro se*, after consulting with Second Circuit Court of Appeals Administrative Attorney Judy Pisnanont by phone this morning, states, as follows:

There is ONLY a single respondent to this mandamus proceeding, Southern District of New York Judge Kenneth M. Karas – inasmuch as none of the 34 defendants to the underlying lawsuit before him, *Center for Judicial Accountability, Inc. et al. v. Legislative Correspondents Association, et al.* (25-CV-8370), were ever served with a summons and complaint by reason of Judge Karas' issuance of a *sua sponte* November 13, 2025 Order, *within three days of being assigned to the lawsuit*, directing the individual and corporate plaintiffs to show cause why their lawsuit should not be dismissed for lack of subject matter jurisdiction, as to them – and as to which, to date, despite their responsive December 19, 2025 affidavit demonstrating subject matter jurisdiction, he has not ruled – nor acknowledged their request that their time to serve defendants be extended 30 days from the date of his doing so.

FRAP 21(a)(1) reads:

"A party petitioning for a writ of mandamus or mandamus directed to a court must file the petition with the circuit clerk and serve it on all parties to the proceeding in the trial court. The party must also provide a copy to the trial-court judge. All parties to the proceeding in the trial court other than the petitioner are respondents for all purposes."

It does NOT require that "the trial-court judge" be served the petition, but only that he be provided with a copy. This I have done by delivering a copy of petitioners' Verified Petition for a Writ of Mandamus to the Clerk's Office of the Southern District Courthouse, in an envelope addressed to Judge Karas.

Additionally, so that Judge Karas may have the benefit of the live hyperlinks, not accessible from the paper copy, I have e-mailed a pdf, under a coverletter to him, to the SDNY *pro se* office for uploading to the electronic docket for 25-CV-8370. My transmitting e-mail and the e-mail acknowledgment I received are attached.

_Elena Ruth Sassower_
ELENA RUTH SASSOWER

July 10, 2026
White Plains, New York

# CENTER *for* JUDICIAL ACCOUNTABILITY, INC.

*Post Office Box 8101*          *Tel. (914)421-1200*        *E-Mail:* **mail@judgewatch.org**
*White Plains, New York 10602*                                            *Website:* **www.judgewatch.org**

July 10, 2026

TO:            U.S. District Court Judge Kenneth Karas

FROM:      Elena Sassower, Plaintiff *Pro Se*

RE:           *CJA, et al. v. LCA, et al.* (25-CV-8370)
                 Verified Petition for a Writ of Mandamus for the Court's Disqualification
                 & Other Relief

Having received no response to my July 1st e-mail entitled "Must plaintiffs be burdened with filing petition for a writ of mandamus to compel the Court's rulings?", your answer is obvious.

Pursuant to Federal Rule of Appellate Procedure 21, plaintiffs must provide you with a paper copy of the Verified Petition for a Writ of Mandamus. I will drop it off at the Clerk's Office at the courthouse, in an envelope addressed to you, before taking the train to Manhattan to pay the $600 filing fee at the Second Circuit Court of Appeals.

Attached to this letter is a pdf of the Verified Petition I am e-mailing to the Second Circuit for electronic filing, so that you can have the benefit of its substantiating hyperlinks, inaccessible from the paper copy.

        *Signatures on next page to preserve above live hyperlinks.*

                         s/ Elena Sassower

                Read & Approved: s/ Gary Zerman, Esq.

U.S. District Court Judge Karas   Page Two   July 10, 2026

Read & Approved by Gary Zerman, Esq. _____

cc: Second Circuit Court of Appeals

## elena@judgewatch.org

| | |
|---|---|
| **From:** | elena@judgewatch.org |
| **Sent:** | Friday, July 10, 2026 12:37 PM |
| **To:** | 'Pro_Se_Filing@nysd.uscourts.gov' |
| **Cc:** | Gary Zerman (gzerman243@gmail.com) |
| **Subject:** | Pro Se Filing -- 25-CV-8370 |
| **Attachments:** | upload-july10-2026-ltr-to-karas.pdf |

**TO:** *Pro Se* Intake Unit

Above-attached for filing is Plaintiffs' July 10, 2026 letter to Judge Karas entitled "Verified Petition for a Writ of Mandamus for the Court's Disqualification & Other Relief

Thank you.

Elena Sassower, *Pro Se* Plaintiff
10 Stewart Place, Apt. 2D-E
White Plains, NY 10603
914-421-1200
elena@judgewatch.org

**elena@judgewatch.org**

| | |
|---|---|
| **From:** | Pro Se Filing <pro_se_filing@nysd.uscourts.gov> |
| **Sent:** | Friday, July 10, 2026 12:37 PM |
| **To:** | elena@judgewatch.org |
| **Subject:** | IMPORTANT INFORMATION, PLEASE REVIEW |

IMPORTANT INFORMATION, PLEASE REVIEW

Your email has been received by the Pro Se Intake Unit of the United States District Court for the Southern District of New York. (This is not the United States Bankruptcy Court.)

Documents from pro se litigants that meet the required standards for electronic filing will be filed and will appear on the ECF docket within two business days of receipt (see required standards below). If you send your document by email and it is accepted for filing, you should not deliver a hard copy version to the court. Requirements for Filing a New Action by Email:

- Documents must be attached to the email in PDF format, no larger than <u>15</u> megabytes;
- The complaint must be signed by the filing party;
  - Fee requirements and instructions:
  - **Please note that your complaint will not be reviewed until the court receives payment of the <u>filing fees</u>.**
- Payment must be made within 30 days of the date your case is assigned a docket number. If mailing payment, please send a certified check, bank check, or money order to: **Cashiers Room 260, 500 Pearl Street, New York, NY 10007**.
- Your payment must include the docket number, which you can learn by calling (212) 805-0175.
- If you have not consented to e-service, your docket number will also be mailed to you, at the address provided on the complaint, in a form order that will include payment instructions. If you do not make payment within 30 days of the date a docket number is assigned to your case, the action will be dismissed without prejudice.
- If you cannot pay the filing fees and want to request that the court waive the filing fees, you must email an <u>application to proceed *in forma pauperis*</u>.

Filing Documents in an Existing Case by Email:

- Documents must be attached to the email in PDF format, no larger than 10 megabytes;
- The email and attached document must contain the docket number, filer's name, address, and telephone number;
- Documents must be signed by the filing party;
- Any additional comments, questions, or other messages in the email will be disregarded;
- Any additional correspondence included in the email will be disregarded.

For any submission, if your document does not appear on the ECF docket within two business days, it has not met the required standards for electronic filing. If so, you must submit your document to the court in paper form by (a) sending your document by mail, or overnight delivery service, to the appropriate courthouse listed below; or (b) delivering your document in-person to the appropriate courthouse listed below between the hours of 9:30 AM to 1:30 PM; or (c) depositing your document after hours in the court's night depository box at the 500 Pearl Street, NY, NY courthouse.

1

United States Courthouse
Pro Se Intake Unit
500 Pearl Street
New York, NY 10007
or
United States Courthouse
Pro Se Intake Unit
300 Quarropas Street
White Plains, NY 10601

**Additional resources:**

- Complete filing instructions
- Consent to accept service of documents electronically. **Please note that, by consenting to electronic service, you will no longer receive documents by postal mail.**
- **For free legal advice, you may make an appointment with the City Bar Justice Center Legal Clinic for Pro Se Litigants** by completing the intake form to make an appointment. If a litigant has questions about the intake form or needs to highlight an urgent deadline already disclosed in the form, the clinic can be contacted by phone (212-382-4794) or email (fedprosdny@nycbar.org). **Alternatively, you may leave a message with 212-659-6190.**